# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA for the use and )
benefit of CORTEZ III SERVICE CORPORATION, a )
New Mexico corporation, )
)
          Plaintiff and Counterdefendant, )
)
v. )  CASE NO. CIV 00-0133 JC/KBM
)
PMR CONSTRUCTION SERVICES, INC., A New )
Mexico corporation, and CAPITOL INDEMNITY )
CORPORATION, a Wisconsin corporation, )
)
          Defendants and Counterclaimants. )

## CORTEZ III SERVICE CORPORATION'S PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Use Plaintiff, Cortez III Service Corporation requests that the Court make the following Findings of Fact and Conclusions of Law in the trial of this matter:

## FINDINGS OF FACT

### A. Uncontested Background Facts

1. Use Plaintiff, Cortez III Service Corporation (Hereinafter "Cortez"), was at all times relevant to this action a corporation organized and existing under the laws of the State of New Mexico with its principal place of business located at Albuquerque, New Mexico, and is qualified to bring and maintain this action (Second Amended Complaint, ¶3; Capitol Indemnity Corporation's Answer, ¶2).

2. Defendant, Capitol Indemnity Corporation ("Capitol"), is a Wisconsin corporation authorized to transact business as a surety upon bonds or undertakings within the state of New Mexico (Second Amended Complaint, ¶5; Capitol Indemnity Corporation's Answer, ¶3).

3.      PMR Construction Services, Inc. ("PMR") was at all times relevant to this action a corporation with its principal place of business located in Albuquerque, New Mexico (Second Amended Complaint, ¶4; Capitol Indemnity Corporation's Answer, ¶2).

4.      In 1997, the United States, through the Defense Special Weapons Agency ("DSWA") requested proposals from contractors designated as small disadvantaged businesses by the Small Business Administration ("SBA") under Section 8(a) of the Small Business Administration Act to provide labor, materials, equipment tools and supervision to furnish construction, facility maintenance and test support for DSWA Permanent High Explosives Test Site ("PHETS") White Sands Missile Range, New Mexico (Deposition of Toni Sandoval).

5.      PMR submitted a proposal, entered into discussions with DSWA and submitted a Best and Final Offer to DSWA for the construction and other services under the request for proposals (Exhibit 39). PMR's proposal and Best and Final Offer indicated that Cortez III would be a subcontractor to PMR (Exhibit 39, PMR 02257).

6.      PMR was the successful proposer, and On September 18, 1997, PMR entered into a tripartite agreement with SBA and DSWA, contract number DSWA02-97-D-0001 ("Prime Contract") for the construction and other services under the request for proposals for an initial contract price of $1,365,028.50 for the base period of one year (Exhibit 41, p. 1 and 1a) with four option years exercisable by DSWA (Exhibit 41, p. 34, ¶ F-2). The Prime Contract was an indefinite quantity contract (Pretrial Order, Stipulated Fact No. 4)

7.      Recurring tasks for the base period and option years were priced as part of the original contract (Exhibit 41, p. 2, 4-7). The Prime Contract also had firm fixed prices for specified Delivery Orders for the first year (Exhibit 41, p.3).

8. The Prime Contract had a guaranteed minimum price of $713,000 for Delivery Orders for the base period (Exhibit 41, p. 66, ¶ H-20).

9. DSWA had the right to add to existing Delivery Orders and issue new Delivery Orders during the contract period (Exhibit 41, see e.g. p. 2 at Line Item No. 0002). Pricing for additional Delivery Orders was to be on a firm fixed prices basis, calculated by multiplying agreed labor hours by predetermined loaded labor rates contained in the Prime Contract (Exhibit 41, p.8-27).

10. The Prime Contract required PMR to provide performance and payment bonds (Exhibit 41, p.76-77, ¶ I-87).

11. As a condition to providing payment and performance bonds to PMR, Capitol through the bonding agent for PMR, Commercial West Insurance Agency ("Commercial West") required that Cortez provide a Subcontract bond (Exhibit 3).

12. Cortez provided a surety bond issued by American Bankers Insurance Company of Florida in the amount of $607,000 guaranteeing performance of work and payment of labor, materials and services consumed or used in connection with the subcontract (Exhibit 7).

13. On October 1, 1997, PMR and Cortez III entered into Subcontract No. PMR-FY97-01 ("Subcontract") for provision of labor and materials by Cortez for performance of the Prime Contract (Exhibit 32). The basis for payment under the Subcontract was time and materials (Exhibit 32, p.1).

14. Capitol initially furnished payment and performance bonds for each Delivery Order under the Prime Contract, but DSWA requested a single performance bond and payment bond in the amounts of $713,000 and $356,500 respectively (Testimony of Diane Garrett

McClain).

15. On October 9, 1997, Capitol as surety and PMR as principal furnished a performance bond in the amount of $713,000 and payment bond in the amount of $356,500 (Exhibit 42).

16. Capitol and Commercial West invoiced PMR for the premium for the performance and payment bonds (Exhibit 9).

17. PMR had failed to include the cost of payment and performance bonds in its proposal to DSWA (Exhibit 52). DSWA agreed to pay for the performance and payment bonds required by the Prime Contract (Exhibit 55).

18. DSWA exercised all four option years under the Prime Contract (Pretrial Order, Stipulated Factual contention No. 3).

19. During the course of performance between October 1, 1997 and August 31, 1999, when Cortez ceased performance under the Subcontract, Cortez furnished labor and materials as required by the Subcontract. Cortez invoiced PMR for such labor and materials in the total amount of $3,585,621.38 (Exhibit 73).

20. PMR failed to pay substantial sums to Cortez for labor and materials furnished under the Subcontract, which amount is alleged by Cortez to be $1,052,785.18 (Second Amended Complaint, ¶ 13).

21. Cortez filed this action seeking, *inter alia,* recovery upon the payment bond issued by Capitol on February 2, 2000 and recovery against PMR for breach of contract (Complaint).

22. On May 29, 2002, PMR filed for protection under Chapter 11 of the Bankruptcy Act. All claims against PMR in this action were stayed by that filing.

23.     PMR and Cortez have entered into an agreement settling all claims between PMR and Cortez in this action for an amount in excess of the penal sum of the payment bond, which settlement does not release Capitol form any liability it may have upon the payment bond. That settlement agreement is subject to the approval of the Bankruptcy Court.

### Undisputed Facts Related to Cortez III's Claim Against the Payment Bond

24.     The unpaid amount due from PMR to Cortez for work performed under the Subcontract exceeds the $356,500 penal sum of the payment bond (Pretrial Order, Stipulated Factual Contention No. 8).

25.     The action on the bond was brought within one year of the last labor furnished or material supplied by Cortez in performance of the work of the Prime Contract (Pretrial Order, Stipulated Factual Contention No. 9).

### Findings Related to Capitol's Defense of Discharge or Release of the Payment Bond

26.     On October 13, 1997, Carla Sonntag, a bond agent at Commercial West wrote to PMR concerning the payment and performance bonds stating that "Because these bonds were issued to cover the guaranteed minimum of the base year, they will stay in effect for the life of the contract." (Exhibit 8). This statement was not contested by Capitol which received a copy of the letter.

27.     The October 13, 1997 letter went on to state:

> Therefore premium will be charged for the entire amount of the contract as well. Periodic status inquiries will be made by the surety and premium billed for all amounts over the initial billing for the blanket bonds.
>
> The only way to alleviate this continual billing is to terminate the surety's liability. Termination of the surety's liability is accomplished by returning the original blanket bond to us with a letter from the contracting agency

stating that they are no longer required.
(Exhibit 8).

28. In 1998 Commercial West made several inquiries on Capitol's behalf to DSWA regarding the status of the Prime Contract (Exhibit 24).

29. On February 9, 1998, Patricia McDaniel, the DSWA Contracting Officer for the Prime Contract, wrote to PMR notifying PMR of the Government's intent to raise the contract ceiling price for the base period from $1.3 million to $6 million (Exhibit 52).

30. In March 1998, Roxanne Rivera of PMR contacted Toni Sandoval, the DSWA Contract Specialist assigned to the Prime Contract because Commercial West had notified PMR that an increase of bond premium would be forthcoming based on the increased contract value (Deposition of Toni Sandoval; Exhibit 45).

31. Toni Sandoval researched the bond requirements of the Government related to the Prime Contract (*Id.*).

32. On August 20, 1998, Patricia McDaniel wrote to PMR indicating that the FAR (Federal Acquisition Regulation) states that for an indefinite quantities contract the contracting officer shall consider the contract price to be the minimum guaranteed quantity, and that when the guaranteed minimum quantity was exceeded the contracting officer may require additional performance and payment bond protection. Ms. McDaniel determined that additional bond protection for an amount exceeding the minimum quantity was not required (Exhibit 10). A copy of this letter was provided to Commercial West and Capitol on the same day (*Id.*).

33. The August 20, 1998 letter was consistent with the provisions of the Prime Contract (Exhibit 41, p. 76-77, ¶ I-87).

6

34. The August 20, 1998 letter was also consistent with the terms of the bonds (Exhibit 42).

35. In January, 1999, Capitol determined that it would not provide PMR with any further bonding (Testimony of Diane Garrett McClain; Exhibit 26).

36. On March 16, 1999, Diane Garrett (now McClain), a bond underwriter for Capitol, instructed Commercial West to bill additional premium to PMR based on the Carla Sonntag letter of October 8, 1997 (Exhibit 27).

37. During the course of the Prime Contract DSWA changed its name to Defense Threat Reduction Agency ("DTRA"). There was no change in the duties of Patricia McDaniel or Toni Sandoval or any change in the contract duties of PMR or Cortez as a result of the change in name.

38. On March 31, 1999, DSWA's contracting officer's technical representative provided Commercial West with a status report indicting that the total amount awarded under the Prime Contract had risen to $4,818,251.88 (Exhibit 12).

39. Based on this status report Commercial West and Capitol invoiced PMR for an additional bond premium of $35,257 for "contract overrun" (Exhibit 13).

40. On April 19, 1999, Roxanne Rivera sent a copy of the Patricia McDaniel letter of July 20, 1998 concerning the waiver of additional bonding to Commercial West (Exhibit 15).

41. On April 27, 1999, Lu McCory, a bonding agent at Commercial West wrote to PMR asserting Capitol's entitlement to additional premium based on the Sonntag letter (Exhibit 16).

42. On May 7, 1999, Capitol made a direct demand on PMR and Paul and Roxanne

7

Rivera for payment of the additional premium (Exhibit 17).

43. On June 17, 1999, Jess Wadle, a vice president of Capitol spoke to Toni Sandoval of DSWA regarding the bonding requirements for the Prime Contract. He requested a letter stating that the bonded portion of the contract was complete, capped at $713,000 and releasing Capitol from any further liability (Deposition of Toni Sandoval; Exhibit 44).

44. Toni Sandoval drafted a letter for Patricia McDaniel's signature to respond to Jess Wadle's request including a release from liability (Deposition of Toni Sandoval; Exhibit 62).

45. Patricia McDaniel declined to sign the draft letter as written and removed the language indicating that Capitol was released from liability based on her judgment that the release from liability was a legal issue and that she was not empowered to release Capitol (Deposition of Toni Sandoval; testimony of Patricia McDaniel; Exhibit 62).

46. On June 22, 1999, Patricia McDaniel sent a letter to Jess Wadle referring to the FAR provision governing bonds on indefinite quantity contracts and indicating that the bonded portion of the work was complete, that bond protection beyond the guaranteed minimum of $713,000 was not necessary and that Capitol had fulfilled its responsibility as regards the minimum guarantee of work. The letter did not contain any language releasing Capitol from liability (Exhibit 18).

47. DSWA did not terminate or release Capitol's liability under the existing performance and payment bonds by the June 22, 1999 letter (Testimony of Patricia McDaniel).

48. Upon receipt of Patricia McDaniel's letter, Capitol and Commercial West reversed the invoice to PMR for additional bond premium (Exhibits 19 and 21).

49. Capitol's records after the June 22, 1999 letter continued to show an existing bond

penalty of $713,000 (Exhibit 30).

50. When Cortez made inquiry of DSWA in December 1999 regarding payment bonds, a copy of the $356,500 payment bond was provided to Cortez III (Exhibit 21).

51. In September, 2000, after suit had been filed, Tom Heger, legal counsel for Capitol wrote to Patricia McDaniel seeking additional clarification on Capitol's liability under the bond after the first year of the Prime Contract (Exhibit 43). Patricia McDaniel did not respond to this letter (Testimony of Patricia McDaniel).

52. In an October 19, 2000 Interim Large Loss Report, Capitol indicated a loss reserve of $356,502 for Cortez' claim (Exhibit 31).

53. At no time prior to the institution of litigation by Cortez did Capitol take the position that its liability under the bonds was terminated or released upon the completion of $713,000 of work by PMR.

54. Cortez was not involved at any stage in the discussions concerning the additional bonds or release or termination of the obligations of Capitol under the bonds (Testimony of JK King; testimony of Craig Wilson).

55. By their terms the payment and performance bonds remained in effect for the contract and any authorized modifications (Exhibit 42).

56. The work added to the contract by DSWA and the exercise of the option years were authorized by the Prime Contract.

57. DSWA did not release or terminate Capitol's liability upon the performance and payment bonds.

58. The full $356,500 sum of the payment bond is available for payment of Cortez'

claim.

## Findings Related to Capitol's Joint Venture Defense

59. Prior to 1992, Cortez held contracts with DSWA and its predecessor, Defense Nuclear Agency, for services similar to those which were the subject of the Prime Contract (Testimony of J.K. King).

60. Dale Green was an employee of Cortez during the performance of those contracts. Dale Green also received a share of the profits from the contracts. Prior to that time Dale Green had managed these services as an employee of the Government (Testimony of Dale Green).

61. In 1992 Cortez was ineligible to participate in the contract for these services because it had graduated from the SBA 8(a) program (Testimony of JK King).

62. The SBA suggested that Cortez team up with PMR (*Id.*).

63. PMR and Cortez reached agreement on teaming up for the 1992 contract with PMR as prime contractor and Cortez as subcontractor (Testimony of JK King).

64. PMR was under no compulsion or duress to enter into any agreement with Cortez or to submit a proposal for the 1992 Contract (Testimony of JK King).

65. PMR was successful in obtaining the 1992 contract. The 1992 contract with DSWA was to be for a base year with four option years, billed on a time and materials reimbursement basis with previously agreed loaded hourly labor rates (Testimony of JK King; Exhibit 49).

66. Dale Green became an employee of PMR in 1992 (Testimony of Dale Green; Exhibit 47).

67. PMR and Cortez entered into a subcontract agreement (Testimony of JK King; Exhibit 50).

68. In addition to the subcontract agreement there was an agreement between PMR and Cortez to share profits from the 1992 contract among PMR, Cortez and Dale Green after payment of all expenses incurred in performance of the 1992 contract (Testimony of JK King).

69. Performance of the 1992 Contract was profitable to PMR, Cortez, and Dale Green (*Id.*).

70. PMR controlled the disbursement of funds received from the DSWA under the 1992 contract, and at the end of the contract was unable to pay Cortez a portion of the profits due to Cortez. Cortez took a promissory note for the unpaid portion of its profits (Testimony of JK King).

71. In a 1997 Business Plan PMR indicated that the 1992 contract was established as a teaming agreement and that it planned to bid for the 1997 Prime Contract without Cortez (Exhibit 38 at p. 5 of 6).

72. PMR was under no compulsion or duress to enter into any agreement with Cortez for the 1997 Prime Contract (Testimony of JK King).

73. Cortez developed loaded labor rates for its employees from information provided by Roxanne Rivera and Dale Green (Testimony of JK King).

74. Cortez was not represented at discussions between PMR and DSWA concerning PMR's proposal for the 1997 contract (Testimony of JK King).

75. PMR developed final pricing for delivery orders under the 1997 solicitation (Testimony of JK King).

76. PMR's pricing on delivery orders was substantially below government estimates for the cost of the work (Exhibit 65).

77. Cortez was unwilling to enter into a fixed price subcontract for the 1997 contract because of the risks involved, and warned PMR of the risks of fixed price delivery orders (Testimony of JK King; testimony of Craig Wilson).

78. In its Best and Final Offer for the 1997 Prime Contract, PMR represented to DSWA that Cortez was a subcontractor and that PMR would decide how to most efficiently and effectively employ persons to complete delivery order tasks (Exhibit 39, PMR 02257).

79. PMR also represented to DSWA that it would acquire services from Cortez on a time and materials subcontracting arrangement on an as-required basis, and that Cortez would provide funding for its portion of the work including labor and equipment and all reimbursable materials required under the terms of the contract (*Id.*).

80. In its Best and Final Offer for the 1997 Prime Contract, PMR represented to DSWA that it operates as a corporation for the purpose of its offer, and did not indicate that it considered itself to be a joint venture (Exhibit 39, PMR 02421).

81. PMR did not indicate to Capitol that it intended to bid or perform the 1997 Prime Contract as a joint venture and the bonds were not issued as bonds to a joint venture (Exhibit 42).

82. There was an agreement between PMR and Cortez for a sharing of the profits from the 1997 Prime Contract, with PMR, Cortez and Dale Green to share in net profits after payment of all costs. PMR insisted on a higher share of net profits under the 1997 contract (Testimony of JK King).

83. Dale Green remained program manger and an employee of PMR under the 1997

Prime Contract until his retirement in 1999 (Testimony of Dale Green).

84. In his role as program manager, Dale Green approved all material purchases by Cortez, developed Delivery Order pricing, negotiated Delivery Order pricing with DSWA, and approved the assignment of Cortez personnel to the project (Testimony of Dale Green; testimony of JK King; Exhibit 51).

85. James Burnett, an employee of Cortez, was the field superintendent for the Delivery Orders until he was removed at Paul Rivera's request. James Burnett oversaw PMR and Cortez field personnel and assisted Dale Green in developing Delivery Order pricing (Testimony of Dale Green).

86. PMR requested Cortez to provide a quality control supervisor. Steven Welch was hired by Cortez to provide this service. Steven Welch took over James Burnett's duties after Burnett left the project. Eventually, Welch became an employee of PMR and assumed Dale Green's duties after Dale Green's retirement (Testimony of Steven Welch).

87. The workforces of PMR and Cortez mingled freely in performance of the work under the Delivery Orders and were indistinguishable in the field (Testimony of Steven Welch).

88. Employees of Cortez received paychecks from Cortez. Employees of PMR received paychecks from PMR (*Id.*).

89. Cortez paid for all materials required for the Delivery Orders while it was performing under the Subcontract (Testimony of JK King). Cortez had a right under the Subcontract to be reimbursed for materials provided by Cortez.

90. Cortez paid all of its employees for labor performed under the Subcontract (Testimony of JK King). Cortez had a right under the Subcontract to be reimbursed for labor

performed by Cortez employees.

91. Paul and Roxanne Rivera raised potential claims against DSWA at meetings with Patricia McDaniel and Toni Sandoval and were directed by Patricia McDaniel to submit their claims (Testimony of Patricia McDaniel; Exhibit 57).

92. Cortez urged PMR to submit claims and offered to provide legal assistance (Testimony of Craig Wilson).

93. PMR made the unilateral decision not to pursue claims against DSWA (Testimony of Craig Wilson).

94. PMR principals and employees negotiated all modifications to the Prime Contract with DSWA (Testimony of JK King).

95. Cortez's primary business is as a service contractor for Government contracts to run programs and Government owned facilities (Testimony of Craig Wilson).

96. In its other contracts, Cortez provides services to the Government as a prime contractor and as a joint venture partner (*Id.*).

97. Cortez does not enter into joint ventures without a written joint venture agreement (Testimony of Craig Wilson).

98. Whether acting as a prime contractor or as a joint venture partner, Cortez always strives to present the Government customer with a seamless organization, so that it is not always discernable who employs a particular individual (Testimony of Craig Wilson).

99. Cortez's arrangement with PMR did not operate in the same way as Cortez's actual joint ventures (*Id.*).

100. Cortez did not intend to enter into a joint venture with PMR (Testimony of JK

14

King).

101. PMR and Cortez did not have any joint bank accounts (Testimony of Craig Wilson).

102. Cortez submitted periodic invoices for labor and material furnished to PMR and would provide information regarding its invoices at PMR's request (Testimony of JK King).

103. Cortez was not responsible for compiling or invoicing PMR's labor costs or other costs for performance of the Prime Contract (Testimony of JK King).

104. Cortez did not have control over the timing or amounts of invoices from PMR to DSWA (Testimony of JK King).

105. Payments received from the Government were deposited in PMR's accounts (Testimony of Roxanne Rivera).

106. PMR was paid for work performed by Cortez (Testimony of Roxanne Rivera).

107. Cortez did not have control over the timing or amounts of payments from PMR to Cortez (*Id.*).

108. PMR certified to DSWA that it had paid all subcontractors and suppliers from prior payment received by it and that it would pay its subcontractors and suppliers from funds received based on the certification (Exhibit 37).

109. These certifications were untrue when they were made by PMR (Testimony of Roxanne Rivera; testimony of JK King).

110. PMR derived a significant benefit from having Cortez purchase materials (Testimony of Craig Wilson).

111. PMR had control over the performance of the Prime Contract.

## CONCLUSIONS OF LAW

112. The Court has personal jurisdiction over the parties.

113. The Court has subject matter jurisdiction over this action pursuant to the Miller Act (40 U.S.C. §§ 270a *et seq.*).

114. Venue is proper in the District of New Mexico.

115. Cortez is a proper claimant under the Miller Act.

116. Cortez timely brought this action under the Miller Act.

117. Capitol's obligations under the payment bond were not terminated or released.

118. Cortez and PMR were not a joint venture on the Prime Contract.

119. Cortez is entitled to an award against the payment bond issued by Capitol in the principal amount of $356,500.

120. Federal law permits the Court to award prejudgment interest beyond the penal sum of a Miller Act bond. *Insurance Company of North America v. United States*, 951 F.2d 1244 (Fed. Cir. 1991).

121. Federal Courts look to the law of the forum state to determine whether prejudgment interest may be awarded on a claims against a surety bond. *Illinois Surety Company v. John Davis Company*, 244 U.S. 376 (1917); *Golden West Construction Company v. United States ex rel.Bernadot*, 304 F.2d 753 (10th Cir. 1962). Under the law of New Mexico, an award of prejudgment interest on a claim under a payment bond is a matter of right. *State of New Mexico ex rel. Bob Davis Masonry, Inc. v. Safeco Insurance Company of America*, 118 N.M. 558, 883 P.2d 144 (1994). The rate of interest fixed by NMSA 1978 § 56-8-3 for interest on a debt due under contract is fifteen percent from the date due. *Id.* The date of the filing of the

Complaint may be regarded as the date for interest where there is no prior demand upon the surety. *Illinois Surety Company, supra; Golden West Construction Company, supra.* The date of the Complaint in this action is February 2, 2000. Cortez III is entitled to an award of prejudgment at the rate of 15% interest from February 2, 2000 to the date of judgment on the $356,500 penal sum of the bond.

122. Cortez is entitled to an award of its costs of this action in an amount to be determined.

> SHEEHAN, SHEEHAN & STELZNER, P.A.
> Attorneys for Cortez III Service Corporation
> 707 Broadway N.E., Suite 300 (87102)
> Post Office Box 271, Albuquerque, New Mexico 87103
> Phone: (505) 247-0411; Fax: (505) 842-8890
>
> By: _____
> DAVID P. GORMAN
> TIMOTHY M. SHEEHAN

I hereby certify that a true copy of the foregoing
was served via facsimile and mailed to the following
counsel of record:

Kevin M. Sexton
Post Office Box 36210
Albuquerque, New Mexico 87190

this 7th day of October, 2002.

_____
David P. Gorman

E:\DATA\TXTLIB\30700072\Pldgs\findings.1.wpd

17