

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA for the use and
benefit of CORTEZ III SERVICE CORPORATION, a
New Mexico corporation,

    Plaintiff,

v.

PMR CONSTRUCTION SERVICES, INC., a New
Mexico corporation, and CAPITOL INDEMNITY
CORPORATION, a Wisconsin corporation,

    Defendants.

**Case No. CIV 00-0133
JC/KBM**

### CAPITOL INDEMNITY CORPORATION'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

COMES NOW Defendant, Capitol Indemnity Corporation ("Capitol"), by and through its attorneys, Sturges & Houston, P.C. (Joe A. Sturges, Esq. and Kevin M. Sexton, Esq.) and respectfully submits, for the Court's consideration, the following proposed Findings of Fact and Conclusions of Law.

### Proposed Findings of Fact

1. Defense Threat Reduction Agency ("DTRA") is the successor to Defense Special Weapons Agency (DSWA), which was the successor to Defense Nuclear Agency ("DNA"). For purposes of this matter DNA, DSWA and DTRA will be considered the same entity.

2. Under the Small Business Act (15 U.S.C. §§631 *et seq.*) [the "Act"], the Small Business Administration is empowered to enter into contracts with departments and agencies of the United States Government and, subsequently, to let subcontracts to socially and economically disadvantaged small businesses. The foregoing is generally known as the Small Business Administration's 8(a) Program. The small businesses awarded subcontracts under this program are typically referred to as 8(a) contractors.

3. Between 1984 and 1987, Cortez III Service Corporation ("Cortez III") entered into a tripartite contract with DNA and the Small Business Administration ("1984 Contract") to provide certain construction-related services at White Sands Missile Range ("WSMR").

4. Cortez III was an 8(a) contractor for the entirety of the 1984 Contract.

5. Dale Green was Cortez III's project manager for the entire 1984 Contract.

6. Dale Green and Cortez III entered into a profit and loss sharing arrangement for the 1984 Contract.

7. In or about 1987, Cortez III entered into a tripartite contract with DNA and the Small Business Administration ("1987 Contract") to provide certain construction-related services at WSMR.

8. The 1987 Contract was a one (1) year contract, with four (4) possible option years, exercisable solely at the discretion of DNA. DNA exercised all four (4) option years under the 1987 Contract. Accordingly, the 1987 Contract ran from 1987 until 1992.

9. Dale Green was Cortez III's project manager for the entire 1987 Contract.

10. Dale Green and Cortez III entered into a profit and loss sharing arrangement for the 1987 Contract.

11. Sometime during the 1987 Contract, Cortez III "graduated out of" the 8(a) program. Accordingly, Cortez III could not bid, as a general contractor, on any further contracts with DNA (or successor entities) at WSMR.

12. At some point in 1992, Cortez III approached PMR Construction Services, Inc. ("PMR"), an 8(a) contractor, with a plan whereby Cortez III and PMR would "team up" to submit a response to DNA's solicitation for construction-related services at WSMR.

13. Pursuant to Cortez III's plan, PMR, as general contractor, would provide 15% and Cortez III, as "subcontractor", would provide 85% of the labor required under

the 1992 solicitation.

14. Further, in accordance with Cortez III's proposal, PMR would be required to hire Dale Green as its project manager.

15. Finally, under Cortez III's plan, PMR, Cortez III and Dale Green would enter into a profit and loss sharing arrangement, pursuant to which profits and losses would be shared as follows: Cortez III (65%); Dale Green (20%); and PMR (15%).

16. At some point in 1992, PMR accepted Cortez III's offer and the parties "teamed up" to submit a response to DNA's 1992 solicitation.

17. Cortez III and PMR were the successful bidders under the DNA's 1992 solicitation.

18. On or about September 12, 1992, PMR entered into a tripartite contract – Contract No. DNA002-93-C-001 – with DNA and the Small Business Administration ("1992 Contract") to provide certain construction-related services at WSMR.

19. The 1992 Contract was an indefinite-delivery type contract.

20. DNA required no performance and payment bonds on the 1992 Contract.

21. The 1992 Contract was a one (1) year contract, with four (4) possible option years, exercisable solely at the discretion of DNA.

22. Pursuant to the 1992 Contract, PMR was required to provide all labor, materials and supplies for the project on a time and materials basis.

23. On or about October 1, 1992, PMR and Cortez III entered into Subcontract No. PMR-FY92-01 ("1992 Subcontract"), pursuant to which Cortez III agreed to provide direct labor, materials, equipment, tools and supervision for the project on a time and materials basis.

24. The 1992 Subcontract was prepared by Cortez III.

25. As required, PMR entered into a profit and loss sharing arrangement with Cortez III and Dale Green, pursuant to which the parties were to share profits and looses on the 1992 Contract as follows: Cortez III (65%); Dale Green (20%); and PMR

(15%).

26. Cortez III had concerns as to whether the profit and loss sharing arrangement among PMR, Cortez III and Dale Green violated the Small Business Act. Accordingly, the profit and loss sharing arrangement was never reduced to writing or disclosed to DNA or the Small Business Administration.

27. Labor was provided under the 1992 Contract as follows: Cortez III (85%) and PMR (15%).

28. As required, PMR hired Dale Green as its project manager for the 1992 Contract.

29. Sometime following award of the 1992 Contract, Cortez III and PMR agreed that Cortez III, subject to a right of reimbursement, would provide 100% of the materials and supplies necessary to perform the 1992 Contract.

30. The agreement between Cortez III and PMR, pursuant to which Cortez III agreed to provide 100% of the materials and supplies necessary to perform the 1992 Contract, was never reduced to writing.

31. DNA exercised all four (4) option years under the 1992 Contract. Accordingly, the 1992 Contract ran from 1992 until 1997.

32. Cortez III, PMR and Dale Green shared profits under the 1992 Contract in accordance with their profit and loss sharing arrangement.

33. Sometime in 1997, Cortez III and PMR, once again, "teamed up" to submit a response to DSWA's 1997 solicitation for construction-related services at WSMR.

34. Cortez III and PMR were the successful bidders under the DSWA's 1997 solicitation.

35. On or about September 18, 1997, PMR entered into a tripartite contract – Contract No. DSWA02-97-D-0001 – with DSWA and the Small Business Administration ("1997 Contract") to provide certain construction-related services at WSMR.

36. The 1997 Contract was a one (1) year contract, with four (4) possible option years, exercisable solely at the discretion of DSWA.

37. Pursuant to the 1997 Contract, PMR was required to provide all labor, materials and supplies for the project on a firm-fixed-price basis.

38. On or about October 1, 1997, PMR and Cortez III entered into Subcontract No. PMR-FY97-01 ("1997 Subcontract"), pursuant to which Cortez III agreed to provide direct labor, materials, equipment, tools and supervision for the project on a time and materials basis.

39. The 1997 Subcontract was also prepared by Cortez III.

40. PMR entered into a profit and loss sharing arrangement with Cortez III and Dale Green, pursuant to which the parties were to share profits and losses on the 1997 Contract as follows: PMR (45%); Cortez III (35%) and Dale Green (20%).

41. The profit and loss sharing arrangement was never reduced to writing or disclosed to DSWA or the Small Business Administration.

42. Cortez III and PMR agreed that Cortez III, subject to a right of reimbursement, would provide 100% of the materials and supplies necessary to perform the 1997 Contract.

43. The agreement between Cortez III and PMR, pursuant to which Cortez III agreed to provide 100% of the materials and supplies necessary to perform the 1997 Contract, was never reduced to writing.

44. Labor, according to the 1997 Subcontract was to be divided on the 1997 Contract as follows: Cortez III (85%) and PMR (15%).

45. The day-to-day work during pertinent portions of the 1997 Contract was supervised, directed and controlled, in part, by James Burnett (project superintendent); Mackie Gonzales (foreman) and Steve Welch (safety / quality assurance), all Cortez III employees.

46. Dale Green continued as project manager on the 1997 Contract until he retired in or about March 1999. Upon his retirement, Steve Welch, who at that time was serving as project superintendent and a Cortez III employee, became project manager and a PMR employee.

47. At a meeting held on or about March 1, 1999, PMR and Cortez III agreed that, from that point forward, Cortez III would supply all hourly labor on the 1997 Contract, but under the supervision of PMR.

48. Subsequent to the retirement of Dale Green, the profit and loss sharing arrangement between PMR and Cortez III on the 1997 Contract was modified as follows: PMR (55%) and Cortez III (45%).

49. In or about August 1999, Cortez III terminated the 1997 Subcontract.

50. In accordance with the provisions of Paragraph I-87 of the 1997 Contract (*i.e.*, FAR 52.228-15), PMR was required to provide a performance bond with a penal sum equal to 100% of the specified minimum quantity for the Contract and a payment bond with a penal sum equal to 50% of the specified minimum quantity for the Contract.

51. Pursuant to Paragraph H-20 of the 1997 Contract, the specified minimum quantity was $713,000.

52. Accordingly, PMR, by and through its surety, Capitol Indemnity, provided the DSWA with a performance bond (penal sum of $713,000) and a payment bond (penal sum of $356,000). Bond No. 728529.

53. The premium charged by Capitol Indemnity for the referenced performance and payment bonds ($10,630) was paid for by DSWA.

54. At the time Capitol Indemnity issued the performance and payment bonds, the 1997 Contract was a one (1) year contract, with a specified minimum quantity of $713,000.

55. In accordance with the provisions of Paragraph I-87 of the 1997 Contract [*i.e.*, FAR 52.228-15(b)(2)(ii)], if the original contract price was $5 million or less, DSWA could have required additional payment bond protection if the contract price was increased.

56. Specifically, Paragraph I-87 of the 1997 Contract [*i.e.*, FAR 52.228-15(b)(2)(iii)] provided that DSWA could have secured additional payment bond protection by directing PMR to increase the penal sum of the existing payment bond or obtain an additional bond.

57. During the "basic period" of the 1997 Contract (i.e., September 18, 1997 to September 17, 1998), PMR was paid approximately $1.5 million.

58. Despite the contract price having been increased from $713,000 to approximately $1.5 million during the "basic period" of the 1997 Contract, DSWA required no additional payment bond protection.

59. During the "basic period" of the 1997 Contract, Cortez III was paid as follows: (1) as of April 24, 1998 [$379,493.04]; (2) as of July 2, 1998 [$857,167.58]; and (3) as of August 19, 1998 [$1,221,421.41].

60. The payment bond expressly provides that Capitol Indemnity's obligation, under the referenced bond, is void if PMR promptly makes payment to all persons having a direct relationship with PMR for labor, material or both in the prosecution of the work provided for in the contract.

61. During the "basic period" of the 1997 Contract (which was the only "contract" in force and effect at the time the payment bond was issued), PMR made payments to Cortez III for labor, material or both, well in excess of the penal sum of the payment bond (i.e., $356,500).

62. Capitol Indemnity received no consideration to extend its liability under the performance and payment bonds beyond the "basic period" of the 1997 Contract or for a contract amount greater than $713,000.

## Proposed Conclusions of Law

1. The "contract" for which performance and payment bonds were issued by Capitol Indemnity was the "basic period" of the 1997 Contract (i.e., September 18, 1997 to September 17, 1998).

2. Capitol Indemnity's obligation, under the referenced payment bond was void upon PMR, during the "basic period" of the 1997 Contract, promptly making payment to Cortez III for labor, material or both, well in excess of the penal sum of the payment bond (i.e., $356,500).

3. There was no additional payment bond protection required by DSWA beyond the "basic period" of the 1997 Contract or for a contract amount greater than $713,000.

4. There was no consideration received by Capitol Indemnity for its liability under the performance and payment bonds to be extended beyond the "basic period" of the 1997 Contract or for a contract amount greater than $713,000.

5. The performance and payment bonds, subsequent to the "basic period" of the 1997 Contract or payments made in excess of $713,000, became null and void due to a lack of consideration.

6. Cortez III, as a joint venturer with PMR during the pertinent portion of the 1997 Contract, has no standing to assert a claim against the referenced payment bond.

STURGES & HOUSTON, P.C.

By _____
Joe A. Sturges
Kevin M. Sexton
Attorneys for Capitol Indemnity Corporation
P.O. Box 36210
Albuquerque, NM 87190
(505) 884-4200

## Certificate of Service

I hereby certify that a copy of the foregoing pleading was sent, via facsimile, to Timothy M. Sheehan, Esq. and David P. Gorman, Esq., Sheehan, Sheehan & Stelzner, P.A., on this 7th day of October, 2002.

Kevin M. Sexton