## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,
for the use and benefit of CORTEZ III SERVICE
CORPORATION, a New Mexico corporation,

        Plaintiff,

vs.                                          CIV No. 00-133 JC/KBM

PMR CONSTRUCTION SERVICES, INC.,
a New Mexico corporation, and CAPITOL
INDEMNITY CORPORATION, a Wisconsin
corporation,

        Defendants.

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

      THIS MATTER comes before the Court following a one-day bench trial on October 15, 2002. The Court terminated the proceedings pending the parties' further briefing on the issue of whether a Miller Act payment bond given for the minimum guaranteed amount of an indefinite delivery/indefinite quantity contract can be released or canceled where no additional bond premium is paid. The question is dispositive, and thus its resolution critical. After considering the evidence, oral arguments, and written briefs, the Court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

      **A.**    **Miller Act**

      1.    Plaintiff, Cortez, is a corporation organized under the laws of the State of New

Mexico, with its principal place of business in Albuquerque, New Mexico.

2. Defendant, Capitol Indemnity Corporation ("Capitol"), is a Wisconsin corporation authorized to transact business as a surety upon bonds or undertakings within New Mexico.

3. PMR Construction Services, Inc. ("PMR") is a corporation organized under the laws of the State of New Mexico, with its principal place of business in Albuquerque, New Mexico.

4. On or about September 18, 1997, PMR entered into a tripartite agreement with the Small Business Administration and the Defense Special Weapons Agency ("DSWA"), contract number DSWA02-97-D-0001 ("Prime Contract"), for construction and other services at the White Sands Missile Range. The initial contract price was $1,365,028.50. The Prime Contract was an indefinite delivery contract.

5. The Prime Contract was a one-year contract, with four possible option years, exercisable solely at the discretion of DSWA.

6. DSWA exercised all four option years.

7. The Prime Contract had a guaranteed minimum price of $713,000 for Delivery Orders for the base period.

8. On or about October 1, 1997, PMR and Cortez entered into subcontract agreement No. PMR-FY97-01, pursuant to which Cortez agreed to provide direct labor, materials, equipment, tools and supervision for the project on a time and materials basis.

9. The Prime Contract required PMR to provide performance and payment bonds.

10. On or about October 9, 1997, Capitol, as surety and PMR as principal, furnished a performance bond in the amount of $713,000, and a payment bond in the amount of $356,500.

11. The payment bond states an expiration date of September 30, 1998.

12. Capitol and Commercial West, the bonding agent for Capitol, invoiced PMR for the premium for the performance and payment bonds.

13. The premium amount was $10,630. Ex. 9.

14. At the time Capitol Indemnity issued the performance and payment bonds, the Prime Contract was a one-year contract, as the government had not exercised any of the option years. At that time, the specified minimum quantity was $713,000.

15. In accordance with the provisions of section I-87 of the Prime Contract and the Federal Acquisition Regulation ("FAR") 52.228-15(b)(2)(ii):

> ...
> (ii) [i]f the original contract price is $5 million or less, the Government may require additional protection if the contract price is increased.
> (iii) The Government may secure additional protection by directing the Contractor to increase the penal sum of the existing bond and to obtain an additional bond.

16. During the basic period of the Prime Contract (from September 18, 1997 to September 17, 1998), Cortez was paid approximately $2,458,081.

17. Despite the contract price increasing from $713,000 to approximately $1.5 million during the basic period, DSWA did not require additional payment bond protection. Nor did DSWA request additional bond protection when it exercised its option years under the contract.

18. Specifically, in two separate letters approximately one year apart, the government stated that additional bond protection was not necessary. Exs. 10, 18.

19. Prior to the second letter (during the first option year), Capitol attempted to invoice PMR for an additional premium due to an increase in the contract price. Ex. 13; Trans. at 186:7-16.

20. However, upon receipt of the Government's second letter, Capitol ceased attempting to collect any additional premium amount. Ex. 19, 20.

21. Capitol thus never received any consideration for amounts greater than the guaranteed minimum contract amount of $713,000.

**B.   Joint Venture**

22. Cortez was not represented during the negotiations for the 1997 Prime Contract between PMR and DSWA.

23. In its Best and Final Offer for the 1997 Prime Contract, PMR represented to DSWA that Cortez was a subcontractor and that PMR would decide how to most efficiently and effectively employ persons to complete delivery order tasks.

24. In its Best and Final Offer for the 1997 Prime Contract, PMR did not represent that there was a joint venture.

25. PMR did not represent to Capitol that it intended to bid or perform the 1997 Prime Contract as a joint venture, and Capitol did not issue the bonds to a joint venture.

26. PMR, Cortez, and Dale Green, Cortez' project manager, entered into an oral profit and loss sharing agreement in which the parties were to share the profits as follows: PMR (45%); Cortez (35%); and Dale Green (20%).

27. The parties never reduced to writing the agreement or disclosed it to DSWA or to the SBA.

28. Cortez and PMR orally agreed that Cortez would provide 100% of the materials and supplies necessary to perform the Prime Contract.

29. The parties never reduced to writing the supply and material agreement.

30. PMR controlled the disbursement of funds.

31. Under the Subcontract, labor was divided as follows: Cortez (85%); PMR (15%).

32. During portions of the Prime Contract, Cortez' employees, James Burnett, project superintendent; Mackie Gonzales, foreman; and Steve Welch, safety/quality assurance, supervised, directed and controlled the daily work.

33. Dale Green retired in March 1999, and Steve Welch assumed the position of project manager.

34. Subsequent to Dale Green's retirement, PMR and Cortez modified the profit sharing agreement under the Prime Contract as follows: PMR (55%) and Cortez (45%).

35. On March 1, 1999, PMR and Cortez agreed that Cortez would supply all hourly labor, but it would be under the supervision of PMR.

36. During the trial, the Court determined that testimony regarding whether there was a joint venture between PMR and Cortez was not necessary.

## CONCLUSIONS OF LAW

**A.  Miller Act**

1. The Court has personal jurisdiction over the parties.

2. The Court has subject matter jurisdiction over the parties pursuant to the Miller Act,

40 U.S.C. §270(a) *et seq.*.

3. Venue is proper in the State of New Mexico.

4. Cortez is a proper claimant under the Miller Act.

5. Cortez timely brought this action under the Miller Act.

6. To determine Indemnity's liability, the Court must look at the contract, the payment bond, the Miller Act, and any applicable regulations. *United States for use and benefit of B & M Roofing of Colo. v. AKM Assoc.*, 961 F.Supp 1441, 1444 (D.Colo. 1997).

7. The Miller Act is highly remedial and thus entitled to liberal construction and application. "But such a salutary policy does not justify ignoring plain words of limitation and imposing wholesale liability on payment bonds."*United States for use and benefit of Sherman v. Carter*, 353 U.S. 210, 216 (1957) (citations omitted). As such, "[t]he Act provides a broad but not [an] unlimited protection." *Id.*

8. The question before the Court is whether Capitol Indemnity is liable upon a payment bond for the guaranteed minimum contract amount of $713,000 when the contract amount exceeded the guaranteed minimum during the option years, but Capitol did not receive any additional premium for its increased liability.

9. Plaintiff contends that the remedial nature of the Miller Act requires this Court to find that the payment bond continues into the option years, as there is nothing in the contract or the bond limiting it to the basic year.

10. Defendant argues that it is not liable to Cortez for its claims past the basic period for three reasons. First, Cortez was paid an amount in excess of the contract price. Second, DSWA specifically declined to require bond protection beyond the basic

period, or for a contract amount above $713,000. Third, due to DSWA's determination, Defendant did not receive consideration to extend the payment bond for the option years.

11. In a factually similarly case, *United States for the use and benefit of Modern Electric v. Ideal Electronic Security Co., 868 F.Supp. 10 (D.D.C. 1994),* the court found that even though the bond did not have an expiration date, it was a one-year bond, as the contract unambiguously stated:

> *[t]he Performance and Payment Bonds will be separate for the base year and each option year.* If option is exercised, the contractor shall be required to provide the appropriate Performance and Payment Bonds *at that time.*

*Id.* at 13 (emphasis added in original). The court agreed with the surety that the language "at that time" indicated that the contract's terms intended for the bond to be a one-year bond. "It is elementary that a surety on a bond is bound only to the extent and under the circumstances stipulated in the obligation...[T]he liability of a surety is not to be extended, by implication, beyond the terms of his contract." *Id.* at 14 (citation omitted).

12. In this case, there is nothing in the payment bond or the contract stating that the bond continues beyond the basic year or is intended for amounts in excess of $713,000.

13. In another similar case, in which the indefinite delivery/indefinite quantity contract was for a one-year period with optional renewal years, the surety contended that even though it billed and received additional premiums, it was not liable for any materials

        or labor past the first year. The court disagreed, finding that the surety's actions of billing and receiving premiums "[were] not consistent with limiting liability to the initial year of the Contract." *AKM Assoc.*, 961 F.Supp. at 1445.

14. In this case, although Capitol invoiced for an additional premium due to an increase in the Prime Contract amount, it never received consideration for any amount beyond the guaranteed minimum of $713,000.

**Conclusion**

Although the Miller Act is remedial and entitled to liberal construction, it is improper to impose wholesale liability on payment bonds. In the present case, there is nothing in either the Prime Contract or the payment bond indicating that the bond was intended to extend beyond the minimum guaranteed amount of $713,000. Moreover, although Capitol initially attempted to invoice for a contract amount greater than the guaranteed minimum, the Government specifically determined that the additional bonding was not necessary. The Court thus finds that Capitol is not liable to Cortez in the amount of $356,500.

**B.    Joint Venture**

15. A joint venture is formed "when two or more parties (1) enter into an agreement, (2) to 'combine their money, property or time in the conduct of some particular business deal,' (3) agree to share in the profits and losses of the venture jointly, and (4) have the 'right of mutual control over the subject matter of the enterprise or over the property." *Lightsey v. Marshall*, 992 P.2d 904, 907 (N.M. Ct. App. 1999) (citing *Fullerton v. Kaune,* 382 P.2d 529, 532 (1963)).

16. In this case, Defendant has not produced any evidence indicating that PMR and

>    Cortez entered into "an agreement to 'combine their money, property or time....'"

17. Moreover, although PMR and Cortez agreed to share profits and losses, there is no evidence indicating that, at that time, the parties intended for the agreement to be the basis for a joint venture. In fact, PMR's Best and Final Offer continually refers to Cortez as the subcontractor. Ex. 39.

**Conclusion**

The Court thus finds that PMR and Cortez did not enter into a joint venture for the 1997 Prime Contract.

_____

Wherefore, Plaintiff's Complaint for Breach of Contract and on Payment Bond, filed February 2, 2000 (*Doc. 1*) is dismissed with PREJUDICE.

IT IS SO ORDERED.

Dated January 9, 2003.

_____
SENIOR UNITED STATES DISTRICT JUDGE